UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　Plaintiff,<br>v.<br><br>CAROLYNE SUSAN JOHNSON,<br><br>　　　　　　　　　Defendant. | Civ. Action No. 1:18-cv-00364 |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges the following against Defendant Carolyne Susan Johnson ("Johnson"):

## SUMMARY OF ALLEGATIONS

1. This action concerns fraudulent conduct orchestrated by Carolyne Susan Johnson ("Johnson") from at least January 2011 through December 2012 in connection with her public shell company, T&G Apothecary, Inc. ("T&G"), and activity by Johnson that aided and abetted a separate fraudulent scheme at E-Waste Systems, Inc. ("EWSI") from at least November 2012 through January 2015.

2. Johnson was the self-named President, Chief Executive Officer, Treasurer and Director of T&G, a shell company that used an Ohio address and purported to be developing a line of personal care products for women. Her role at T&G was arranged by Edward Panos ("Panos"), who made a career out of creating fraudulent shell companies, taking them public, and selling them to private entities for hundreds of thousands of dollars. T&G never actually developed, manufactured or sold any products. Instead, Johnson used her shell company to orchestrate a sham private offering of T&G shares to family members, friends, and

acquaintances, and then secretly transferred those shares through another person to Panos. Johnson then took action to register the resale of the privately offered shares with the SEC, falsely stating that the shares were controlled by 30 individuals and failing to disclose Panos' ownership and control. Panos later sold T&G and arranged for a payment of $50,000 to Johnson for her efforts.

3. In the midst of the T&G scam, Panos introduced Johnson to the CEO of EWSI, Niel Martin Nielson ("Nielson"). Johnson went on to aid and abet Nielson in orchestrating a scheme to defraud EWSI's public shareholders. EWSI, a company originally located in Columbus, Ohio, purported to be in the electronic waste recycling industry. Johnson, as its Secretary and Treasurer, knowingly or recklessly provided substantial assistance to Nielson who, through false press releases and SEC filings, created a grossly inflated impression that EWSI was expanding rapidly across the United States, Europe, and Asia, especially China, and successfully growing its revenues. In fact, EWSI had no or virtually no operations, the vast majority of its agreements with third-parties had no economic substance, and it was improperly recognizing revenues from companies that it did not control, and whose revenues it should not have reported as its own.

4. Johnson, in concert with Nielson, also aided and abetted EWSI's failure to maintain accurate corporate books and records, particularly with respect to EWSI's purported business in China. EWSI reported the revenues of certain entities in China (the "China Companies") as its own based on sham contracts that did not reflect the true relationship between EWSI and the China Companies. EWSI paid the China Companies for the benefit of reporting their revenues as its own, despite EWSI having no relationship with the China Companies beyond this payment-for-revenues scheme.

5.     Johnson profited by more than $150,000 from her participation in the EWSI scheme by selling millions of shares of EWSI common stock into the market at artificially inflated market prices.

6.     By engaging in the foregoing conduct at T&G, Johnson violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

7.     By engaging in the foregoing conduct at EWSI, Johnson aided and abetted violations by Nielson of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and aided and abetted violations by EWSI of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

8.     The SEC seeks injunctive relief, disgorgement of Johnson's ill-gotten gains together with prejudgment interest, civil penalties, and officer and director bar, a penny stock bar, and any other appropriate relief.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(a), 77t(d), and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78aa] and 28 U.S.C. § 1331.  Johnson has also consented to the jurisdiction of this Court and waived any objection to venue in this District.

## DEFENDANT

10.     **Carolyne Susan Johnson** is a resident of Cincinnati, Ohio.  Johnson worked as a securities paralegal at a law firm until 2006.  She worked with Panos from 2006 to June 2011 handling formation of corporate entities and their registrations and filings with the SEC.  From

2011 through 2015, Johnson was Secretary, Treasurer, Vice President, and registered agent for EWSI, a publicly traded company that was previously a Panos-created shell. She is currently retired.

### OTHER RELEVANT INDIVIDUALS AND ENTITIES

11. **Edward F. Panos** is a resident of Park City, Utah. Panos was in the shell promotion business until recently, and, in December 2016, consented to a judgment relating to allegations overlapping with some of those included in this complaint. *See SEC v. Panos*, Civ. No. 16-CV-02473-TFH (D.D.C. Dec. 21, 2016).

12. **T&G Apothecary, Inc.** ("T&G") was, at all times relevant to this complaint, a Nevada corporation that listed an address in Gahanna, Ohio, as its principal place of business. Its shares were majority-owned by Johnson and directly and indirectly majority-controlled by Panos. T&G purported to be in the business of developing personal care products. Effective December 9, 2011, the resale of certain T&G shares became registered pursuant to a Form S-1 filed with the SEC; and, on or about March 15, 2012, its shares became publicly traded when FINRA cleared T&G for quotation on OTC Link. Johnson and Panos exited their holding in T&G no later than December 2012, when T&G was sold to a Canadian company.

13. **Niel Martin Nielson** is a United States citizen residing in London, England. He has been EWSI's President and CEO since June 2011. He was also EWSI's Acting CFO from Jun 22, 2011 to September 23, 2011; November 28, 2012 to December 21, 2012; and June 7, 2013 through the present. He is currently the only officer or director of EWSI.

14. **EWSI** is a Nevada corporation which, at all relevant times, listed a Las Vegas, Nevada mailbox facility as its principal place of business. The company previously was known as Dragon Beverage, Inc. ("Dragon Beverage"), a non-operating shell company that purported

4

to manufacture and sell energy drinks.  On or about May 5, 2011, Dragon Beverage changed its name to EWSI, after acquiring 100% of the outstanding shares of common stock of E-Waste Systems (UK) Ltd., a private company formed by Nielson in the United Kingdom.  EWSI became a reporting company with the SEC pursuant to Exchange Act Section 12(g) beginning on April 17, 2012.  EWSI ceased all business operations by the end of 2014, and has been delinquent in its filings with the SEC since April 15, 2015, when it failed to file a Form 10-K for the year ending December 31, 2014.  An initial decision revoking the registration of EWSI's securities was entered on November 21, 2017, and ratified on January 23, 2018.  EWSI's opportunity to petition for review of that decision closed on February 13, 2018.

## FACTS

## T&G APOTHECARY, INC.

15.     In 2006, after years of working as a securities paralegal for a law firm that had served as corporate counsel for Panos and his shell companies, Johnson left the firm and continued to work with Panos, including by serving as a registered agent for many of his companies and assisting him with stock offerings and registrations and filings with the SEC.

16.     On January 17, 2011, at Panos' request, Johnson formed T&G, a private Nevada corporation, which purported to be developing a line of personal care products for women.  T&G never actually developed, manufactured, or sold any products.  It remained a non-operating shell company throughout the relevant period.

17.     Johnson named herself President, CEO, Treasurer, and Director of T&G, and arranged for a family member to be named as Secretary.  She became a majority shareholder of T&G when she issued herself 5 million shares of T&G common stock.

18.     Despite Johnson's stock ownership and positions within T&G, Panos retained control over the business decisions and affairs at all relevant times.  Johnson knew or was reckless in not knowing that she had an obligation to disclose Panos as a control person for T&G, but failed to do so.

19.     On or about January 20, 2011, Johnson signed board resolutions approving a private offering of an additional 3 million shares of T&G common stock under Regulation D of the Securities Act.

20.     Johnson and a family member then identified thirty family members, friends, and acquaintances willing to participate in the offering, which, in reality, was a sham designed to put most of the 3 million privately offered shares into Panos' hands, while disguising his ownership and control.

21.     At the request of Johnson and her family member, each participant signed a subscription agreement for the purchase of T&G shares at $0.01 per share and wrote a check to T&G for $100.  Simultaneously, each participant signed a blank stock purchase agreement purporting to sell their newly purchased shares to an unnamed purchaser for an unspecified amount on an unspecified date.  Johnson reimbursed each individual in cash for the full amount of their check, and sometimes provided an additional incentive payment.

22.     Johnson provided the signed but blank stock purchase agreements to an associate, who, in turn, delivered them to Panos.  Between 2011 and 2012, Johnson's associate followed Panos' instructions to complete the signed stock purchase agreements, assigning shares to Panos, nominee accounts controlled by Panos, and Panos' business associates and using invented sale dates and prices.

23.     After the T&G offering was complete and acting at Panos' direction, Johnson then registered via a Form S-1 registration statement the resale of the shares that purportedly had been sold to the 30 individuals in the private offering.  The Form S-1 stated that thirty individuals held a total of 37.5% of the outstanding shares in the company, when in actuality, because of the above-described actions taken by Johnson and others during the private offering, Panos controlled most or all of these shares.

24.     Johnson knew or was reckless in not knowing because of her above-described actions that Panos controlled these shares at the time the false Form S-1 registration statement was filed and became effective.  Johnson also helped Panos acquire undisclosed control of shares in at least two other public companies – Arthur Kaplan Cosmetics, Inc. and Dragon Beverage, Inc. – using the same techniques.

25.     Johnson filed T&G's Form S-1 with the SEC on April 7, 2011.  It became effective on December 9, 2011.

26.     FINRA cleared T&G for quotation on OTC Link on or around March 15, 2012.

27.     Johnson and Panos exited their positions in T&G stock in or around August 2012, when, at Panos' arrangement, a private company in Vancouver, Canada, agreed to acquire T&G through a reverse merger.  Panos worked with Johnson, outside counsel, and the Canadian-based management team to draft and finalize the transaction documents, including signing over Johnson's majority interest in T&G to the Canadian company.

28.     On or about August 14, 2012, the Canadian company wired $250,000 to Panos for the public T&G shell; approximately one week later, in exchange for a $50,000 payment, Johnson resigned from T&G and executed documents transferring her controlling shares to a

representative of the Canadian company, who became sole officer and director of the new company.  The transaction was finalized on or about December 3, 2012.

29.     By engaging in the conduct described in this complaint, Johnson violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)(3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## E-WASTE SYSTEMS, INC.

### A.      Johnson's Role at EWSI

30.     On June 22, 2011, Nielson became EWSI's President and CEO and Johnson was appointed as EWSI's Secretary and Treasurer.  Johnson had been introduced to Nielson by Panos as a seasoned securities paralegal with public company experience who could advise Nielson on EWSI's obligations as a public company, handle SEC filings, and maintain the books and records.

31.     Johnson was responsible for drafting EWSI's filings with the SEC and press releases, and she coordinated with Nielson, external counsel, and auditors to complete those filings and press releases.  She also drafted board resolutions and corporate documents for EWSI, drafted the paperwork necessary to enable EWSI to issue shares to insiders and outsiders, and interacted with transfer agents, brokers, and other agents as necessary to enable those individuals subsequently to sell their shares.  Johnson was also responsible for opening and maintaining, and was the principal signatory on, EWSI's bank accounts.  She was EWSI's official record-keeper.

32.     Johnson substantially assisted Nielson in making EWSI appear to be a functioning company when it was not.  She used board resolutions, press releases, and regulatory filings (on

Forms 8-K, 10-Q, 10-K, and others) to enable Nielson to create a façade of legitimacy and growth at EWSI.

**B.**    **EWSI's Announced Growth Plans**

33.    On June 30 2011, one week after Nielson became its CEO and President and Johnson its Secretary and Treasurer, EWSI announced that it had reorganized its operations and that its new mission is to create a global e-waste recycling and electronic asset recovery services company.  The announcement states that EWSI intends to enter the e-waste industry through acquisitions of high-quality companies with strong management teams.

34.    In the months and years to come, however, EWSI entered into (i) teaming, branding, and licensing agreements in the United States, Europe, Asia, and elsewhere, that it could not perform and which were expected to result in no revenues for the company; (ii) sham agreements in China that purportedly allowed it to recognize the China Companies' revenues as its own but did not reflect the economic realities of EWSI's relationship with those companies; and (iii) acquisitions of small, inexpensive companies on the brink of failure.

35.    Nielson, with substantial assistance from Johnson, issued press releases and filed Forms 8-K and 10-Q on behalf of EWSI touting each acquisition, teaming, licensing and branding agreement as material events in the company's history that moved it toward dominance in the e-waste market.  These announcements often falsely claimed that each agreement would bring in millions of dollars of revenues for the company.  In fact, it was apparent that EWSI was unable to sustain operations at any of its locations for long and its agreements with third-party companies lacked substance, were nonbinding, and yielded no revenues for EWSI.  Further, to preserve the share price increase generated by news of these recent acquisitions, Nielson and Johnson failed to disclose material adverse events at these operations.  Johnson sold EWSI shares throughout 2013 and 2014 and profited from EWSI's artificial share price.

**C.**      **Johnson Substantially Assisted Nielson's Scheme and Misrepresentations**

    **i)**      **Johnson Provided Substantial Assistance to Nielson in Creating the False Impression that EWSI had Continued Operations in Ohio and was Expanding Across the U.S.**

36.     From October 2011 through July 2012, through a wholly owned subsidiary named E-Waste Systems (Ohio), Inc. ("E-Waste Ohio"), EWSI operated a small electronic recycling and asset recovery company in Columbus, Ohio.

37.     E-Waste Ohio was a two-truck operation that largely engaged in cash-based transactions.  The company principally purchased used copy machines, which it refurbished and resold or hauled to third-party facilities that E-Waste Ohio paid to recycle the waste.

38.     After almost a year of sustained losses from these operations and unable to pay employees, contractors, and vendors, EWSI ceased its Columbus, Ohio operations.

39.     On July 31, 2012, EWSI reached an agreement to transfer E-Waste Ohio's business and assets back to its former owner, and it vacated the premises on or around September 8, 2012.  Johnson was aware of these events as they occurred.

40.     The facility in Columbus, Ohio was EWSI's only operating facility at the time, and was a significant subsidiary pursuant to 17 C.F.R. § 210.1-02(w).  Due to her experience managing SEC filings for public microcap companies like EWSI, Johnson knew or was reckless in not knowing that the disposition of the business and assets was a material event requiring disclosure in a Form 8-K.  Johnson also knew that Nielson relied on her public-company experience to advise him on, and to make, required SEC filings.

41.     Nonetheless, EWSI failed to announce that it had ceased operations and disposed of the business and assets until November 19, 2012.  On that date, in its Form 10-Q for the period ended September 30, 2012, EWSI finally announced that E-Waste Ohio had ceased operations, that its assets had been disposed of, and that it had been dissolved.

42.     The Form 10-Q, which was signed by Nielson, also states that EWSI has relocated its business to a new premises in Columbus, Ohio, where it plans to re-establish a new base of operations.  In reality, and as Johnson knew, EWSI merely moved some inconsequential assets to a storage facility and did not have any e-waste operations anywhere in the world at the time.

43.     Johnson knew or was reckless in not knowing that EWSI did not have continuing operations in Ohio because, as EWSI's Treasurer, she was responsible for payment of all deposits, rent, payroll, and payments to vendors.  At a minimum, by the end of August 2012, Johnson was aware that EWSI had terminated its employees in Ohio, did not hire any new ones, did not enter into a lease for a new facility, did not pay for transportation of any of its assets to a new facility, and that the person upon whom EWSI had relied to locate a new facility and continue operations in Ohio had not been paid for weeks.

44.     Nonetheless, on January 11, 2013, EWSI filed a Form 8-K with the SEC which made public its supposed business plan.  EWSI proclaimed itself to be a "market-leading, integrated business" in the emerging e-waste industry and the only "pure-play public e-waste company."  EWSI stated that it would be entering into joint ventures and making acquisitions with companies that were "profit centers" with "local brand value, [an] experienced management team, and solid commercial relationships with clients of strategic interest to EWSI."

45.     EWSI's trading volume more than tripled on release of this new business plan, and its share price increased by 30%.

46.     Thereafter, Johnson assisted Nielson in issuing announcements that were designed to artificially maintain the price of EWSI's common stock by, among other things, creating the

11

false impression that EWSI had operations in Ohio, and was using its supposed new facility in Columbus, Ohio to expand across the United States.

47.     For example, on January 25, 2013, EWSI filed a Form 8-K with the SEC, announcing a 1-year "teaming agreement" with Village Green Global Inc. ("VGG") of Huntington Beach, California.  The agreement, which was attached to the Form 8-K, provided that EWSI and VGG would share net profits on referred services and also allowed EWSI to identify VGG's facilities in California as part of its network.  EWSI was required to perform services at "EWSI's facilities in Columbus, OH" or another agreed location.  EWSI's trading volume more than tripled the day of this announcement.

48.     EWSI announced similar agreements with other companies.  On January 29, 2013, EWSI filed a Form 8-K announcing a teaming agreement with Cinco Electronics, Inc. of Austin, Texas and Grove City, Ohio; on March 4, 2013, it filed a Form 8-K announcing a teaming agreement with Isidore Electronics Recycling of Los Angeles, California; and on March 15, 2013, it filed a Form 8-K announcing a teaming agreement with Forex Trading LLC, dba Semper Pacific Wealth Strategies, of San Diego, California.  Each of these agreements purported to establish a relationship between EWSI and the counterparty, pursuant to which the parties would refer business to each other and share profits.  Each provided that EWSI would process, or gave it the option to process, referred e-waste at its non-existent Columbus, Ohio facility.

49.     Together, these releases created the false impression that EWSI had actual operations and could process waste in Columbus, Ohio, and that it had a growing network of affiliates and increased profit potential.  In many cases, the announcements were accompanied by a significant increase in the trading volume of EWSI's shares.

50.     Johnson substantially assisted Nielson in preparing and issuing the company's misleading public announcements by (i) drafting written consents of the board of directors approving the company's entry into the agreements, (ii) editing and reviewing certain of the company's statements prior to publication that she knew were false based upon her knowledge of EWSI's Ohio-based operations, and (iii) arranging for their filing with the SEC and publication with media outlets while knowing they gave investors a false impression of EWSI.  While Johnson did not draft the agreements themselves, they were provided to her and were attached to the board materials she prepared and she was aware of the terms of the agreements.

51.     Johnson knew or was reckless in not knowing at the time these filings were made that EWSI had ceased operations at its former Columbus, Ohio facility by July 2012 and did not have any e-waste operations in Ohio or any other part of the world.

52.     After making these announcements, and until it took down its website in 2017 or 2018, EWSI began to publicly identify in press releases and on its website the counter-parties to these agreements as part of its extensive and growing network in furtherance of Nielson's deception of the marketplace concerning EWSI's growth and profit potential.  At no point in time did EWSI process materials, record revenues, or share profits under any of these teaming agreements.

**ii)     Johnson Provided Substantial Assistance to Nielson
        in Creating the False Impression that EWSI had Expanded to
        <u>and was Generating Substantial Revenues from China</u>**

53.     Looking to create the false impression that EWSI not only was expanding beyond the U.S., but also that it was successfully generating revenues, in November 2012, Nielson turned to the services of a consulting firm based in Shanghai, China ("Consulting Firm").  The Consulting Firm's Chairman and Managing Partner, Basilio Chen, claimed to have experience helping U.S. public companies expand into China.

54.     In late March 2013, EWSI entered into a set of five agreements, including an

Operating Agreement and a Management Services Agreement, with Shanghai YaZhuo Jiudian

Gianli Youxian Gongsi ("YaZhuo"), a Chinese company owned and controlled by a Consulting

Firm employee.  Johnson drafted the board consent authorizing EWSI to enter into these

agreements.

55.     EWSI publicly announced its agreements with YaZhuo in a Form 8-K, dated

April 2, 2013, which Nielson signed as CEO and Director, and Johnson drafted.  The Form 8-K

attached EWSI's agreements with YaZhuo and described the agreements as establishing a

relationship in which EWSI would provide management services to YaZhuo in connection with

YaZhuo's current and proposed operations.

56.     The Operating Agreement that was attached to the Form 8-K purports to give

EWSI the power to appoint the members of YaZhuo's board of directors and to appoint its own

senior management to the positions of Chief Executive Officer and President, Chief Financial

Officer, and to other senior management positions at YaZhuo.  EWSI is to guarantee YaZhuo's

contractual obligations to third parties.  In exchange, YaZhuo is required to adopt EWSI's

corporate policies in the conduct of its daily operations, financial management, and relationship

with employees.

57.     The Management Services Agreement that was attached to the Form 8-K purports

to give EWSI both management  and operational authority over YaZhuo's business, and entitles

EWSI to participate in YaZhuo's profits and losses, including, among other things, YaZhuo's

current and prospective business operations, human resources, and business development.  In

exchange, YaZhuo is required to pay EWSI a quarterly management fee, in cash, equivalent to

YaZhuo's net income, as reflected in YaZhuo's quarterly financial statements. The agreement also gives EWSI the right to conduct periodic audits of YaZhuo's books and records.

58.     EWSI's actual relationship with YaZhuo bore no resemblance to the terms of the Operating and Management Services Agreements. EWSI exercised no actual controlling interest in YaZhuo. It did not directly or indirectly manage or operate YaZhuo's business. It did not appoint any of its personnel to executive or senior management positions at YaZhuo. It did not receive any portion of YaZhuo's revenues or profits, or the required quarterly management fee.

59.     The economic reality was that Nielson had effectively purchased the right to report YaZhuo's financial results as though they were EWSI's own, in return for EWSI's payment to YaZhuo and related persons in China in the form of EWSI stock.

60.     On May 20, 2013, EWSI filed its quarterly report on Form 10-Q with the SEC. The report was signed and certified by Nielson. The report reiterated that EWSI has the power to direct YaZhuo's activities and identified YaZhuo as a "consolidated variable interest entity." It represented that EWSI's consolidated financial results for the quarter include revenues from YaZhuo. The report reiterated that EWSI is entitled to a management services fee, payable each quarter, equivalent to all of YaZhuo's net income for such quarter.

61.     Each of the foregoing representations regarding EWSI's relationship to YaZhuo were repeated, in substantially identical language, in EWSI's quarterly reports on Form 10-Q for the second and third quarters of 2013, filed on August 19, 2013, and November 19, 2013, respectively, except in the third quarter EWSI started referring to YaZhuo as Xufu Touzi Guanli

Zixun (Shanghai) Youxian Gongsi ("XuFu").[1] Nielson signed and Johnson drafted and filed EWSI's second and third quarter Forms 10-Q.

62.     YaZhuo was a shell company with no operations of its own.  In order to create the appearance of reportable revenue, YaZhuo entered into a series of agreements ("Lease and Operating Agreements") with the China Companies, pursuant to which the revenue of those entities would be passed through YaZhuo and recognized on EWSI's financial statements.  The written terms of the Lease and Operating Agreements were approved by Nielson and changed multiple times but, at their core, they provided for YaZhuo to take over operations and management of the China Companies.  In their final iteration, the agreements provided for YaZhuo to lease the operations of the China Companies on a quarter-to-quarter basis.  YaZhuo was required to pay each of the China Companies rent, plus costs associated with leasing each company's employees, plus the net profit from operations less 5% of gross revenues.

63.     Johnson received copies of the final executed agreements between EWSI and YaZhuo and between and among EWSI, YaZhuo, and the China Companies.  She was aware of the terms of the agreements.  She was also aware that the agreements had been amended several times during the second and third quarters of 2013, including up to the date on which EWSI filed its second quarter 2013 Form 10-Q, and that the amendments, and the final agreements upon which EWSI recognized revenue for the second and third quarters, were retroactively dated to March 26, 2013, to make it appear that terms had been in effect since the end of the first quarter of 2013.

---

[1]  Because YaZhuo and XuFu were different only in name, the SEC's complaint will refer to both entities as "YaZhuo" throughout.

64.     Contrary to what any of the various agreements provided, the true relationship between and among EWSI, YaZhuo, and the China Companies was that the China Companies' Owners continued to operate their companies independently of YaZhuo and EWSI, except, at the end of each quarter, they provided EWSI with their financial statements for the quarter.  In exchange, Nielson, on EWSI's behalf, agreed to pay the China Companies' Owners and certain Consulting Firm employees, collectively, an amount equal to 10% of each China Companies' reported revenue.  Nielson also signed consulting agreements with certain Consulting Firm employees that permitted him to issue shares to them through EWSI's employee stock ownership plan ("ESOP"), purportedly for work performed for EWSI.

65.     At the conclusion of the third and fourth quarters of 2013, Consulting Firm employees sent invoices to Nielson that included (i) 10% of the revenue amounts that had been generated by the China Companies and that EWSI had recognized in its third quarter 2013 reported financials; and (ii) 10% of the revenue amounts that the China Companies had committed to permitting EWSI to recognize in its fourth quarter 2013 reported financials.

66.     The cover emails that accompanied the Consulting Firm employees' invoices for the third and fourth quarters, which included amounts to be paid to the China Companies' Owners, requested payment in stock.

67.     The China Companies' Owners wanted payment in cash, not stock, but EWSI could only pay in stock.  Nielson repeatedly delayed payments to the China Companies' Owners and attempted to condition payment on successful inclusion of the China Companies' revenue amounts in EWSI's audited financials.  Basilio Chen and a Consulting Firm employee ultimately advised Nielson to pay or the China Companies' Owners would cease to provide to EWSI documentary evidence supporting their reported revenues.

68.     By at least October 2013, and likely earlier, Nielson reached an agreement with Basilio Chen and various Consulting Firm employees that EWSI would issue shares to certain Consulting Firm employees, that they could sell and use the proceeds to compensate the China Companies' Owners.

69.     Nielson made payments to these Consulting Firm employees by instructing Johnson to issue EWSI stock to them through EWSI's ESOP.  Nielson and Johnson referred to shares issued through the ESOP as "S-8 shares" or "shares from the S-8 pool," as EWSI filed Forms S-8 with the SEC to register such issuances to employees and consultants, from a designated pool of shares, pursuant to the written provisions of the ESOP.

70.     Johnson's actions were integral to these share issuances.  Between mid-2013 and mid-2014, Johnson drafted the board resolutions and written consents and obtained the opinion letters necessary to issue S-8 shares to the Consulting Firm employees, including, in January and February 2014, shares she understood would be sold and used to pay the China Companies' Owners.

71.     Throughout the period in which EWSI recognized revenues from China, Johnson knew or was reckless in not knowing that the agreements between and among EWSI, YaZhuo, and the China Companies that were disclosed to the investing public did not call for payments (or share issuances) to be made by EWSI to the China Companies' Owners or any Consulting Firm employee.

72.     Despite this knowledge, Johnson aided Nielson in issuing shares to the Consulting Firm employees and, beginning in January 2014, engaged in actions designed to cover up the fact that EWSI was paying for the revenues from China through share issuances.

73.     For example, in late January 2014, Nielson instructed Johnson to issue Series A preferred shares to a Consulting Firm employee.  Nielson forwarded to Johnson the fourth quarter invoices and a cover email from the Consulting Firm employee.  The email states that the shares are needed on an expedited basis so that the China Companies will have the "agreed funding."  Johnson initially expressed concern to Nielson that there was no basis for issuing Series A preferred shares to the Consulting Firm employee and that the transfer agent would not permit the issuance.  Nielson informed her that EWSI had a binding agreement to issue the shares, but provided no documentation.  Johnson's response to Nielson was "I will go ahead and issue this without any paperwork if I can get away with it."

74.     Johnson's initial draft of the consent stated that the shares were being issued pursuant to an agreement that had been "reached in principal on December 11, 2013" and that was "subject to verification and documentation."  Nielson asked her to revise the consent to indicate that the shares were payment to the Consulting Firm employee for her services in running YaZhuo, including "for payments to executives under contract to us and managed by her under our eManagement/Lease and Operating Agreement programs, largely in China."  The language Nielson provided to Johnson stated that issuance "represents 10% of both actual and forecasted revenues realized by and reported by EWSI under these programs."

75.     Johnson informed Nielson that the language Nielson recommended could cause problems with EWSI's auditor.

76.     Johnson ultimately drafted a consent that identified as the basis for the Series A issuance a "term sheet" supposedly entered into with the Consulting Firm employee on December 10, 2012, and an "agreement in principal" supposedly reached with her on December 11, 2013.   At the time, the only agreement between EWSI and the Consulting Firm employee

19

was a December 4, 2012 agreement, which, on its face, did not apply to the relationships between and among EWSI, YaZhuo, and the China Companies, and did not entitle the Consulting Firm employee to preferred shares. There was no agreement or term sheet dated December 10, 2012, or December 11, 2013.

77. The Series A preferred shares were issued to the Consulting Firm employee and the certificates backdated the issuance date to December 11, 2013, to accelerate her holding period.

78. When EWSI's outside accounting consulting firm later questioned the basis of the issuance, the firm was falsely informed, in a series of email communications on which Johnson and Nielson were copied, that the shares were replacements for shares previously issued to the Consulting Firm employee.

79. The false consent that Johnson drafted to support the issuance of Series A preferred shares to the Consulting Firm employee for payment to the China Companies' Owners was also presented to EWSI's auditor.

80. Additionally, in February 2014, the Consulting Firm employee complained to Nielson that she needed stock that could be sold immediately to pay the China Companies' Owners past-due amounts for the revenues they had delivered in 2013. Because the Series A preferred shares that were issued to the Consulting Firm employee could not be sold immediately, Nielson instructed Johnson to issue 2.5 million unrestricted shares directly to certain of the China Companies' Owners from EWSI's pool of S-8 shares.

81. Johnson knew at the time that the payment of S-8 shares was for the use of the China Companies' revenues, not for management and consulting services. Nevertheless, Johnson drafted consents which stated that the shares were being issued pursuant to EWSI's

"revised 2013 equity compensation plan as filed with the SEC in January 2014."  Johnson knew

or was reckless in not knowing that the China Companies' Owners did not have legitimate

consulting agreements with EWSI, did not provide bona fide services to EWSI, were not entitled

to any payments (or shares) under the agreements that she saw between EWSI, YaZhuo, and the

China Companies, and did not otherwise qualify for shares under EWSI's ESOP.  Further, before

issuing the shares to the China Companies' Owners, Johnson participated in email

communications with Nielson and others in which she learned that EWSI had made

arrangements for the China Companies' Owners to immediately sell their shares to another

employee of the Consulting Firm.

82.     Johnson's falsified consent was provided to EWSI's counsel to obtain the opinion

letter necessary to issue these shares.  The opinion letter provided by counsel relied on her

consent.

83.     The shares were issued to the China Companies' Owners and, at Johnson's

instructions, were mailed by EWSI's transfer agent in hard copy to the Shanghai offices of the

Consulting Firm.  The shares were then immediately sold by the China Companies' Owners to an

employee of the Consulting Firm, in a private transaction.  The Consulting Firm employee

returned the shares to EWSI, along with a stock purchase agreement that reflected the sale.

Johnson ultimately returned the shares to EWSI's pool of S-8 shares and the consents were never

presented to EWSI's auditors.

84.     In all, between December 2012 and July 2014, Johnson issued more than 80

million shares of EWSI common stock to Consulting Firm employees, and 2.5 million shares

directly to certain China Companies' Owners, in addition to Series A preferred stock.  Johnson

deposited the shares directly into brokerage accounts for the Consulting Firm employees in the

United States. The Consulting Firm employees then sold the shares and withdrew the proceeds or transferred them to accounts in China.

85.     In addition, Johnson was aware that the agreements between and among EWSI, YaZhuo, and the China Companies did not conform to the written agreements. As Secretary, Treasurer, and keeper of the EWSI bank accounts, Johnson tracked all monetary transactions involving EWSI, and knew that none of the payments required under the agreements ever occurred.

86.     As a result of Nielson's actions, and Johnson's assistance, for the first three quarters of 2013, EWSI improperly recorded revenue from YaZhuo and the China Companies. EWSI never disclosed that the parties to these agreements never performed on the written agreements.

87.     EWSI publicly reported revenues from YaZhuo and the Lease and Operating Agreements of $2.4 million in its second quarter 2013 Form 10-Q and $2.6 million in its third quarter 2013 Form 10-Q. These publicly reported financials were materially false.

88.     EWSI's second and third quarter 2013 Forms 10-Q were signed by Nielson and drafted, reviewed, and filed by Johnson.

89.     Two independent audit firms resigned in connection with the audit of EWSI's 2013 financial statements. Nielson had multiple communications with EWSI's auditors, but he never informed them of the side arrangements to compensate YaZhuo and the China Companies' Owners in return for the China Companies' financial information.

90.     EWSI's scheme involving revenues from China unraveled swiftly, starting in late February 2014, when one audit firm partner contacted an employee of the Consulting Firm about the substance of YaZhuo's written Lease and Operating Agreements and was told that no actual

business was being conducted between and among EWSI, YaZhuo, and the China Companies. The audit partner provided this information to Nielson and immediately resigned and publicly reported that there appeared to be "no economic substance" to EWSI's relationships in China.

91.     EWSI ultimately removed all YaZhuo and China Companies' revenue from its annual financial statements and restated all previously reported 2013 quarterly financial statements to remove all such revenue.

92.     EWSI's total restated revenues from all sources were zero in the first quarter of 2013 (compared with $229,000 originally disclosed, $4,000 of which was from China); $257,000 in the second quarter (compared with $2.7 million originally disclosed, $2.4 million of which was from China); and $178,000 in the third quarter (compared with $5.3 million originally disclosed, $2.6 million of which was from China).

### iii)     Johnson Substantially Assisted Nielson in Creating the False Impression that EWSI had Successful E-Waste Recycling Facilities in Ohio and New York

93.     In mid-2013, as EWSI was beginning to report its first revenues ever, largely from China, Nielson announced a potential acquisition that he claimed would add millions more in revenues to EWSI's business, when he had no reasonable expectation of doing so.

94.     On July 9, 2013, in a Form 8-K filed with the SEC on July 9, 2013, and in a related press release, Nielson announced that EWSI had signed a letter of intent to acquire WWS Associates, Inc. (also known as "2TRG"), a struggling e-waste processor with no profits and significant liabilities that had facilities in Cincinnati, Ohio and Geneva, New York.  The announcement stated that the acquisition was expected to add more than $5 million in revenues to EWSI's business, solidify its market position in Ohio, and expand its business on the East Coast.

95.     EWSI's trading volume almost doubled on release of its intent to acquire 2TRG, and its share price increased by more than 13%.

96.     Johnson was part of the due diligence team for the acquisition.

97.     By November 27, 2013, Johnson, other members of the diligence team, and Nielson became aware that 2TRG's landlord wanted to impose additional conditions on the company's renewal of its lease in Ohio, and had filed an eviction complaint.

98.     The transaction with 2TRG closed on or about December 4, 2013.  2TRG's assets were inserted into a newly formed, wholly owned subsidiary of EWSI named E-Waste Systems Cincinnati, Inc. ("E-Waste Cincinnati").

99.     EWSI announced the closing of this acquisition in a December 9, 2013 press release and a December 11, 2013 Form 8-K, which Johnson drafted and Nielson signed.  Nielson reiterated in the press release that the acquisition was expected to add as much as $5 million in revenues during the first year.

100.     Nielson had no reasonable expectation that 2TRG would add $5 million in revenues to EWSI in the first year.  He knew from answers provided by 2TRG in May 2013 to EWSI's financial due diligence questions that 2TRG's revenues had been steadily decreasing year over year after losing a key contract in December 2010.  Specifically, 2TRG's financial due diligence responses reflected that 2TRG's revenues for 2012 were $3.8 million (down from $9.7 million in 2010) and, by December 5, 2013, 2TRG was on track to report less than $2.5 million in revenues for 2013.

101.     Johnson, as a member of the due diligence team who had reviewed 2TRG's financials, among other materials, knew or was reckless in not knowing that there was no

reasonable basis for Nielson's assertion that 2TRG was expected to add $5 million in revenues to EWSI.

102.     On January 28, 2014, EWSI was evicted from 2TRG's Cincinnati premises.  It ceased operations in Cincinnati until April 2014 because the build-out of its new location in Springdale, Ohio (the "Springdale Premises") was not yet complete.

103.     By July 2014, E-Waste Cincinnati gave notice to its employees that it would be shutting down the facility and operating with a skeleton crew while preparing for shutdown.

104.     Johnson regularly communicated with the President of E-Waste Cincinnati throughout 2014, and went to the Springdale Premises daily in the summer of 2014.  She was aware of the problems at the Springdale Premises, and had specific knowledge about the planned shut-down and layoffs, having received emails from E-Waste Cincinnati's President confirming the shut down and decision to operate with a skeleton crew on July 13, 2014, and July 14, 2014, respectively.  Nielson also received these emails.

105.     Nevertheless, on November 14, 2014, when EWSI filed its third quarter 2014 Form 10-Q, it did not disclose this development.  To the contrary, EWSI asserted in its Management's Discussion and Analysis that "[a] plan for hiring new employees and business developers [was] being implemented" at E-Waste Cincinnati.  The section captioned "Discontinued Operations" noted that the company had transferred the business and assets of E-Waste Ohio in 2012, but said nothing about the discontinuance of operations at the Springdale Premises.  Johnson reviewed the draft of this filing and provided substantive input and revisions; Nielson signed and certified the filing.

106.     Former employees of the Springdale Premises sued EWSI for unpaid wages in November 2014.  EWSI failed to respond to this lawsuit, and a default judgment was entered on

January 15, 2015.  EWSI never disclosed the lawsuit to its shareholders as required by Item 103

of Regulation S-K.  Johnson was aware of the lawsuit and provided documents on behalf of

EWSI in a subsequent investigation by the U.S. Department of Labor into these unpaid wages.

107.    On December 15, 2014, E-Waste Cincinnati was formally evicted from the

Springdale Premises, and EWSI has not operated in Ohio since then.  Johnson was copied on

emails relating to the pending eviction proceedings starting in September 2014.  Nevertheless,

EWSI's third quarter 2014 Form 10-Q discussed the lease agreement for the Springdale Premises

and the monthly rent without disclosing that EWSI was delinquent on the rent payments and that

the landlord had threatened to evict the company.

108.    On January 28, 2015, E-Waste Cincinnati was also locked out of its facilities in

Geneva, New York after a long dispute with its landlord, and EWSI has not operated in New

York since then.  Johnson knew that E-Waste Cincinnati was in arrears with the Geneva landlord

since September 2014, but did not disclose this information in the third quarter 2014 Form 10-Q.

Without this disclosure, the discussion of EWSI's operations in the Form 10-Q was materially

misleading.

109.    Johnson knew or was reckless in not knowing that disclosures were required for

these events.  As Secretary and Treasurer of EWSI, and as the person upon whom EWSI relied

for advice about SEC disclosure requirements, she owed a fiduciary duty to investors and was

responsible for ensuring that EWSI disclosed these events as required on Form 8-K or in the

appropriate Form 10-Q or 10-K.

110.    Johnson discontinued her involvement with EWSI in February 2015.  EWSI made

no filings with the SEC after this date, except a Form NT 10-K, stating that EWSI would not be

able to file its Form 10-K for the year-ending December 31, 2014, on time.

**D.     Johnson's Sales of EWSI Shares**

111.    During her time at EWSI, Johnson was issued over 8.5 million shares of EWSI common stock, principally between May 2013 and February 2014. She sold over 2 million of those shares for profits in excess of $140,000.

112.    Additionally, on October 25, 2011, 250,000 shares of EWSI common stock were purchased by a member of Johnson's family in a private transaction. Johnson managed all the paperwork for the transaction. The stock purchase agreement listed the purchase price for the shares as $2,500, but Johnson's family member never paid any money for the EWSI shares. In March 2012, the family member's EWSI shares were deposited into a brokerage account jointly controlled by Johnson with the understanding that Johnson would handle all EWSI stock sales and keep any associated profits. In April 2012 and October 2013, all 250,000 shares were sold and yielded $20,993 in profits that went directly to Johnson.

## FIRST CLAIM FOR RELIEF

**Fraud or Deceit in Connection with Sale of Securities**
**Violation of Section 17(a) of the Securities Act**

113.    The SEC realleges and incorporates by reference paragraphs 1 through 29 above.

114.    As a result of her actions at T&G, Johnson directly or indirectly, knowingly or recklessly, by use of any means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, acting with the requisite state of mind, (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers.

115.    By engaging in such conduct, Johnson violated, and unless enjoined will continue to violate, Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 78q(a)(1)-(3)].

### SECOND CLAIM FOR RELIEF

#### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

116.    The SEC realleges and incorporates by reference paragraphs 1 through 29 above.

117.    As a result of her actions at T&G, Johnson, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.    engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon any person.

118.    By engaging in the foregoing conduct, Johnson violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

#### Aiding and Abetting Nielson's Violations of Section 17(a) of the Securities Act

119.    The SEC realleges and incorporates by reference paragraphs 1 through 13 and 30 through 112.

120.    In connection with the EWSI fraudulent scheme, Nielson directly or indirectly, knowingly or recklessly, by use of any means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, acting with the requisite

state of mind, (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers.

121.    Johnson aided and abetted Nielson's violations of Section 17(a) of the Exchange Act by knowingly or recklessly substantially assisting Nielson's conduct.

122.    By reason of the foregoing, Johnson aided and abetted Nielson's violations of Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 78q(a)(1)-(3)].

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Nielson's Violations of Section 10(b) of the Exchange Act

123.    The SEC realleges and incorporates by reference paragraphs 1 through 13 and 30 through 112.

124.    In connection with the EWSI fraudulent scheme, Nielson, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.    engaged in transaction, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon any person.

125. Johnson aided and abetted Nielson's violations of Section 10(b) of the Exchange Act by knowingly or recklessly substantially assisting Nielson's conduct.

126. By engaging in the foregoing conduct, Johnson aided and abetted Nielson's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FIFTH CLAIM FOR RELIEF

#### Aiding and Abetting EWSI's Violations of
#### Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

90. The SEC realleges and incorporates by reference paragraphs 1 through 13 and 30 through 112 above.

91. Johnson aided and abetted EWSI's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by knowingly and recklessly substantially assisting EWSI in failing to make and keep books, records, and accounts that accurately, and in reasonable detail, reflected its true financial condition, including, but not limited to, in accurately recording the EWSI revenues recognized in connection with the Lease and Operating Agreements.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Judgment:

### I.

Permanently restraining and enjoining Johnson, and her agents, servants, employees, attorneys and those persons in active concert or participation with him, who receive actual notice of the order by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)];

## II.

Prohibiting Johnson from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## III.

Prohibiting Johnson from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)];

## IV.

Prohibiting Johnson from accepting compensation for consulting for or advising any issuer of any penny stock;

## V.

Prohibiting Johnson from directly or indirectly, including, but not limited to, through any entity owned or controlled by Johnson, accepting compensation from any public company for serving in any role that involves preparing SEC filings or interacting with the SEC regarding any such filings;

## VI.

Ordering Johnson to disgorge the proceeds of her illegal conduct described herein, plus prejudgment interest;

**VII.**

Ordering Johnson to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VIII.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application of motion for additional relief within the jurisdiction of this Court; and

**IX.**

Granting such other and further relief as this Court may determine to be just and necessary.

Dated: Washington, DC
       May 24, 2018                          Respectfully submitted,


                                             */s/ Suzanne J. Romajas*
                                             Suzanne J. Romajas, Trial Attorney
                                             Virginia M. Rosado Desilets
                                             Sonia G. Torrico
                                             U.S. Securities and Exchange Commission
                                             100 F Street N.E.
                                             Washington, DC 20549-5971
                                             Phone: 202-551-4473

                                             Attorneys for Plaintiff